## HAULE v. CONSUMERS' PARK BREWING CO.

(Supreme Court, Appellate Division, First Department, May 31, 1912.)

CORPORATIONS (§ 88*)—DOMESTIC CORPORATIONS—ISSUANCE OF STOCK—POW-
ERS.

　　Under Stock Corporation Law (Consol. Laws 1909, c. 59), which pro-
vides by sections 53 and 55 that, if the whole of the capital stock shall
not have been subscribed at the time of filing the certificate of incor-
poration, the directors may open books of subscriptions to fill up the
capital stock, and at the time of subscribing every subscriber whose sub-
scription is payable in money shall pay a specified per cent., and that no
corporation shall issue either stocks or bonds except for money, labor
done, or property actually received for the use of the corporation, a cor-
poration organized thereunder may not issue its stock, in pursuance of
an agreement by a foreign corporation with a third person, made for a
cash consideration paid, to deliver its bonds to him, as security for which
it transferred stock to him, though the domestic corporation took over
the assets, and assumed the liabilities of the foreign corporation.

　　[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 337–364,
425–428; Dec. Dig. § 88.*]

　　Clarke and Miller, JJ., dissenting.

Appeal from Trial Term, New York County.

Action by Gustav A. Haule against the Consumers' Park Brewing
Company. From a judgment for plaintiff, and from an order denying
a new trial, defendant appeals. Reversed, and new trial ordered.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGH-
LIN, CLARKE, and MILLER, JJ.

Arthur J. Westermayr, of New York City, for appellant.

Samuel Campbell, of New York City (Bela Darwin Eisler, of coun-
sel), for respondent.

INGRAHAM, P. J. The defendant, originally organized as a
West Virginia corporation, received from the plaintiff a sum of
money upon an agreement by the West Virginia corporation to issue
to him bonds of the corporation, and the corporation transferred to
the plaintiff certain shares of its stock to be held as security for the
delivery of the bonds when the corporation acquired them and was
able to deliver them. In the absence of proof that such a contract
was prohibited by the laws of the state of West Virginia under which
the corporation was organized, I assume that it was valid, and could
have been enforced as against the corporation. The defendant, how-
ever, is a corporation organized on September 26, 1904, under the
laws of the state of New York as a stock corporation. Its stock was
issued in pursuance of the laws of this state.

The complaint alleges that the stock held by the plaintiff in the
West Virginia corporation was transferred to the defendant, the New
York corporation, "which issued a like amount of its capital stock,
share and share alike, for the stock of the Consumers' Park Brewing
Company of Brooklyn, N. Y., surrendered as aforesaid"; "that the
said '50 shares of the capital stock of defendant corporation are still

held by plaintiff in place of the 50 shares surrendered as aforesaid;" and "that the above defendant on or about the date of its organization did take over the assets, and did assume the liabilities of the said the Consumers' Park Brewing Company of Brooklyn, N. Y." (the West Virginia corporation). These allegations are admitted by the answer. The plaintiff now seeks to enforce as against this New York corporation the contract which he had made with the West Virginia corporation to either deliver the bonds of the West Virginia corporation to the plaintiff or pay back to it the money that plaintiff received when the stock of the West Virginia corporation was issued to him.

The defendant was organized under the laws of the state of New York, and its powers and contracts are to be determined by its laws. The issue of stock of a domestic corporation is regulated by article 6 of the Stock Corporation Law, chapter 564 of the Laws of 1890 now re-enacted as part of the Consolidated Laws (chapter 61 of the Laws of 1909 [Consol. Laws 1909, c. 59]). Section 53 of that act provides that, if the whole of the capital stock shall not have been subscribed at the time of filing the certificate of incorporation, the directors may open books of subscriptions to fill up the capital stock, and at the time of subscribing every subscriber whose subscription is payable in money shall pay to the directors 10 per centum upon the amount subscribed by him in cash. Section 55 provides that no corporation shall issue either stocks or bonds except for money, labor done, or property actually received for the use and lawful purposes of such corporation. Any corporation may purchase any property authorized by its certificate of incorporation or necessary for the use and lawful purposes of such corporation, and may issue stock to the amount of the value thereof in payment therefor, and the stock so issued shall be full-paid stock, and not liable to any further call, and neither shall the holder thereof be liable for any further payment under any of the provisions of this chapter. Neither the defendant nor its directors or stockholders had power to issue stock of the defendant corporation except in accordance with these sections. Assuming that the defendant under section 59 of the Stock Corporation Law had power to issue its stock for the purchase of stock of the West Virginia corporation when its stock was thus issued, it became full paid-up stock; but, as I read these provisions of the statute, it had no power to issue its stock to the plaintiff except for actual cash or for the purchase of property as authorized by its certificate of incorporation or necessary for the use and lawful purposes of such corporation. Therefore, when the plaintiff surrendered his stock in this West Virginia corporation to the defendant and received from it a corresponding number of shares of the defendant corporation, he became the owner of the stock of the defendant corporation which was issued in consideration of the transfer to the defendant corporation of the stock of the West Virginia corporation. It would be a distinct violation of the law of this state for a domestic corporation to issue its stock in pursuance of such an agreement as the West Virginia corporation had made with the plaintiff when he acquired the stock in question, and

it had therefore no power to assume a contract made with the West Virginia corporation which would require the defendant to repay to the plaintiff the money paid to the West Virginia corporation when the stock was issued. I think, therefore, that, when the plaintiff transferred the stock held by him in the West Virginia corporation to the defendant and received as a condition of such transfer the 50 shares of stock in the defendant corporation, he became a holder of the defendant's stock not subject to the contract under which it had been issued by the West Virginia corporation. It is not alleged that the West Virginia corporation has been dissolved, and I assume that the plaintiff here still has a cause of action against the West Virginia corporation to recover back the money that he paid to it under the contract set forth in the complaint, but I think that contract was one that a New York corporation could not make as the basis of an issue of its capital stock, and it could not, therefore, assume the obligation of the West Virginia corporation to repay to the plaintiff the sum of money that he paid to the West Virginia corporation on the issue of its stock to him. Therefore, when the plaintiff transferred to the New York corporation the stock that he had received from the West Virginia corporation and all his rights under it, and accepted as consideration for such a transfer the capital stock of the New York corporation, he became a stockholder in that corporation entitled to the rights accruing to such a stockholder, and subject to all of the liabilities and obligations imposed upon a stockholder by the laws of the state of New York.

For these reasons, I think the defendant was not liable under this agreement made by the West Virginia corporation, and that, therefore, no cause of action was established against it. The judgment should be reversed, and a new trial ordered, with costs to the defendant to abide the event.

LAUGHLIN, J., concurs.

McLAUGHLIN, J. (concurring). The corporation could issue its stock only for money paid or property received. It could not issue it as collateral security for money borrowed or for the future delivery of bonds. The alleged agreement upon which the recovery here is permitted was made by the president, without, so far as appears, any authority from the corporation. It thereafter did not ratify his act. The plaintiff as a stockholder and director of the corporation was chargeable with knowledge of the by-laws, and from which it appears the president was not authorized to do what the plaintiff claims.

Not only this, for the findings of the jury that the money advanced by the plaintiff was a loan to the corporation, instead of in payment of its stock, is against the evidence.

CLARKE, J. (dissenting). The complaint alleges that the Consumers' Park Brewing Company of Brooklyn, N. Y., was in 1902 and 1903 a foreign corporation organized under the laws of West Virginia; that plaintiff was a stockholder thereof; that on or about No-

vember 28, 1902, plaintiff, at the special instance and request of said corporation, paid to it the sum of $3,000 for bonds of the said company of the face value of $3,000; that said company, by its president, represented that the said bonds were at that time not in its possession, but were in the possession of the Frank Raub estate, and there was litigation with reference thereto, and said company gave to this plaintiff 30 shares of its capital stock to be held as collateral security and as a substitute for the said bonds. It was agreed at that time that the said stock should be transferred on the books of the company to plaintiff, and that he should receive the dividends thereon, but that, as soon as the company came into possession of the said bonds, the plaintiff was to be given the possession of and the title to said bonds of the face value of $3,000 as aforesaid, and he was to transfer back to the said company said 30 shares of stock. It was further agreed that if for any reason, after the litigation with reference to the said bonds with the Frank Raub estate was completed, the said bonds were not transferred to this plaintiff when demanded, the plaintiff should receive back from the company the said sum of $3,000, with interest, less the dividends paid to this plaintiff on the said stock. It further alleged that on October 7, 1903, at the special instance and request of the company, the plaintiff paid to it $1,700 for bonds of the said company of the face value of $2,000, with similar allegations; that the defendant is a corporation organized September 26, 1904, under the laws of the state of New York, and took over the assets and assumed the liabilities of the former company; that the plaintiff surrendered the above-mentioned 50 shares of the former company to the defendant, and received from it a like amount of its capital stock; that said shares are held by the plaintiff in place of the 50 shares surrendered; that on or about the 1st of May, 1909, this defendant came into possession of the said bonds as aforesaid, and that the plaintiff has demanded of this defendant the said bonds, but that the plaintiff's demand has been refused; that plaintiff hereby offers to transfer and surrender up to the defendant the said 50 shares of capital stock; that the defendant is justly indebted to the plaintiff in the sum of $4,700, with interest, for which he demands judgment.

The answer denies the transaction and agreement alleged, and admits that on or about November, 1907, the defendant corporation came into possession of the bonds in question. It refuses the offer to transfer as set forth in paragraph tenth of the complaint; and for separate and distinct defenses it alleges that plaintiff purchased the said stock and ever since has had possession and exercised ownership over the same, has voted the same at special and stockholders' meetings, and has collected the dividends earned and accrued thereon.

The plaintiff testified that he kept a restaurant and a saloon, and that he bought his beer of the company for 10 years; that about the time of the organization he bought ten shares of stock; that Herman Raub was president of the company from about 1900 to 1907; that Raub came to his place in November, 1902, and asked him to buy some more stock. "I said, 'No,' as I had some already, and would not buy any more. He then said, 'Well, you take those stocks, and we

will exchange them for you for bonds as soon as we get them from the Frank Raub estate, or else give you your money back.' I then said, 'Very well, if that is the case, I will take them for security or as collateral until I get the bonds.' I then drew a check and gave him the check, and he gave me the stock. * * * He said, 'You hold these stocks until I get the bonds from the Frank Raub estate, and I will then exchange them for you for bonds, or give you your money back. That was 30 shares of stock. I got a certificate in my name. Mr. Raub handed me the stock at the same time then and there in my place of business. * * * He also had another officer of the company present, the secretary, Mr. Trieb.' The check was dated November 25, 1902, to the order of the company for $3,000." The second transaction was in 1903 at the company's office in Brooklyn. "Mr. Raub again asked me whether I would not buy any more stock. I said, 'No.' He said, 'You take those stocks the same as you did before and we will exchange them for you for bonds or give you your money back.' I said, 'Mr. Raub, I haven't got $2,000. I only have $1,700.' And he said, 'Very well, we need the money and you take these stocks for security, and we will give you the $2,000 worth of bonds.' He said, 'We will make the same arrangement as we made previously to this about the other stock.' I said, 'Then, very well, I will take them.'" His check for $1,700 was dated October 7, 1903.

The original brewing company was a West Virginia corporation. It became a New York corporation. The stockholders turned in their stock and received an equal number of shares in the new company; the plaintiff receiving one certificate for 60 shares. "Q. What did you say to Mr. Trieb when he handed you one certificate for the 60 shares? A. I said to Mr. Trieb, 'This is a mistake. I only own 10 shares of stock. The other is as collateral security for those bonds that I am to get from the company, from the Frank Raub estate, or get the money back.' Mr. Trieb then said, 'You better take them as I don't want to destroy the certificates, and we can fix that up when we make the exchange for the bonds.'" This conversation took place in the brewing company's office in Brooklyn. "I became a director of the company, and I was a director when the bonds were returned from the Frank Raub estate." The defendant conceded that $100,000 par value of the bonds of the company reached the treasury of the company somewhere along in 1907, these being bonds that the Frank Raub estate held as collateral for a loan of $40,000.

Plaintiff continued:

"When I learned that the bonds had been returned to the company from the Frank Raub estate, I asked Mr. Ludeman, then the president, to exchange those stocks for the bonds which I was promised, or else to give me my money back. Mr. Ludeman said: 'I cannot do that for you in this case. We have nothing to do with Mr. Raub's doings.'"

He testified as to a further conversation with Ludeman:

"'I said I must get my bonds or my money, either one or the other. I am only looking for what belongs to me. I don't want anything from this company only what belongs to me, what I own.' He said: 'I cannot do anything for you. I did not make the arrangement with you. It was Mr. Raub.' I said: 'Mr. Raub done all the business transactions for the company, and this

was a business transaction the same as any other, and I am not looking for anything only what is my belongings.' Mr. Ludeman said: 'We will have to see our counselor in regard to that, and whatever his decision is we will go by.' "

After Mr. Westermayr, the counsel, came back from Europe, "they told me that Mr. Westermayr said there was nothing doing in the case; that they should not give me the bonds. * * * I am willing to transfer 50 shares of the capital stock of the Consumers' Park Brewing Company at any time to the brewery in return for the bonds or my money."

The defendant put in evidence the by-laws of the West Virginia corporation. Under the duties of the president, it was provided:

"He shall be ex officio a member of all standing committees, and shall exercise the general duties of business and management usually vested in the office of president of a company."

It was also provided that he should see that all orders and resolutions were carried into effect, execute all contracts and agreements authorized by the board of directors conjointly with the treasurer.

Plaintiff on cross-examination testified:

"As a director of the old company, Mr. Raub did at a meeting of the directors of the old board present to that board the matter of my arrangement with him for bonds to be substituted for stocks. After I took the first 30 shares of stock, exclusive of the 10 shares that I held previously, Mr. Raub reported that matter in my presence to the board of directors. When he offered the stock to the directors, he made the same offer as he made to me. He said that, if every director would take $5,000 of the stock, they were in need of money, and, if each one takes that stock for collateral security until they get the bonds from the Frank Raub estate, that they will get the bonds or their money back. That was not after my transaction was completed; that was after the 30-share transaction was completed. In other words, I had already received my 30 shares before Mr. Raub made this statement that I have now testified to."

Herman Raub testified:

"I asked him whether he wanted to buy some more stock. (This conversation was at plaintiff's place of business in November, 1902.) He stated that he did not care to buy any just now. He then said that he would buy bonds. I told him: 'We have not any bonds just now. Of course, you know yourself that $100,000 is tied up with the Frank Raub estate.' (That is my brother's estate.) Tied up for collateral security of $40,000. I then told him, 'If you take $5,000 worth of the stock now and if we get the bonds back, why, I will exchange them for you.' He said, 'Well, what security would I have?' I said, 'You can take my word for it.' * * * I went there again, and he said to me that he would take $5,000. He could not make $5,000 available just now. * * *

"Q. What did you say to him when you gave him the certificate for the 30 shares? A. He asked me before he gave me the check whether this was understood according to our last conversation, meaning that when we got the bonds back that he would get them exchanged. I told him we would do so; the company would do it. Well, I spoke as president. This was not as an individual, always as president. * * * He asked for the bonds between the time that I received $4,700 altogether from him and my leaving the brewery as president. He asked pretty nearly at every directors' meeting: 'What is the case about the bonds? Did you get them, or is there any prospect?' I told him no. * * * I reported the various actions, but there was never any vote taken. They did not dispute it. I desire to be understood as testifying that I informed the board of directors of these negotiations from time

to time as they occurred. I first reported the Haule transaction to the board of directors * * * just at the time when I had made the transaction. I explained I said that Mr. Haule took $3,000, and there was a list going around where every director signed that he would take $5,000 worth of the bonds. I spoke to the board of directors for the first time about this ·right after the transaction in 1902. * * * There was never any resolution adopted by the board of directors, either of the old company or of the new company authorizing me to make an arrangement for the sale of the stock on the terms proposed to Mr. Haule. After the first transaction of 30 shares, there was no resolution adopted ratifying my action. There was ·never any resolution adopted after the second transaction and ratifying my action in respect of the same. * * * Nowhere in the books is there any reference made to the exchange of bonds for this stock, and in neither the minute book of the old company or of the new company, to my knowledge, is there any resolution that I was authorized by the board of directors to make this arrangement with Mr. Haule, neither the old or of the new company, to my knowledge.

"Q. And no resolution ratifying your conduct or arrangement with Mr. Haule? A. Yes; the ratification was always in bulk. Whatever I had done was ratified in bulk. There was no resolution ratifying this transaction specifically. There was a resolution adopted ratifying it in bulk. For instance, if I done 10 different things, they were taken up together and the minutes were read, and then a vote was always put on the minutes ratifying the action of the board of managers and of the president. That is in existence in the minutes."

Mr. Ludeman for the defense testified that he became president in March, 1907. He first had a conversation with Haule in regard to the stock or bonds transaction testified to by him in 1907, the latter part of the year. Every time Mr. Haule came there to the directors' meetings he wanted to know what would be done in regard to his stock, and that he wanted some bonds; that he wanted money, and he wanted to sell those bonds, and he wanted to change them.

A verdict for the plaintiff was returned by the jury, and from the judgment entered thereon and the order denying a new trial the defendant appeals.

By their verdict the jury have declared that the story told by plaintiff and his witnesses is true, and that the transaction was in reality a sale of bonds for future delivery and issuance of the stock as collateral thereto under an agreement to pay back the amount received, less dividends. paid upon the stock in case the bonds could not be delivered.

We cannot say that this verdict is against the weight of the evidence. The story was not inherently improbable. If this business corporation, engaged in the brewing business, needed money and was unable to sell and deliver its bonds because they had already been pledged as collateral for a preceding loan, about which there is no question, it was a reasonable transaction that the president should attempt to procure needed funds from the stockholders, especially when the company was a brewer and the stockholder was a saloon keeper dealing in its products. The stockholder refused to accede to the ·request to buy more stock, but upon continued urging agreed to take bonds to be delivered in the future, with an issue of stock as collateral. There is nothing in the record to suggest that the verdict is not fully supported by the evidence.

The original corporation with which this agreement was made was a West Virginia corporation, and, if the transaction was lawful when made with it, the present company, its successor, is bound, because it is conceded that it took all the property, and assumed all the liabilities of its predecessor. The laws of West Virginia governing corporations were not put in evidence, and therefore there is nothing to show that the transaction alleged was in violation of any of the statutory provisions of that state. That it could sell bonds is obvious because the very purpose of creating bonds is to sell them for the purpose of raising money with which to transact the business of the corporation. If it could sell them, it could sell them for future delivery. Whether it could issue its treasury stock as collateral security to a contract for the future delivery of its bonds was a matter to be decided by the laws of the state of West Virginia. That it could not has neither been alleged by the answer nor proved in the case. There is sufficient evidence of authorization and ratification to the president, both under his general powers and by the knowledge and transactions of the board of directors testified to, although not evidenced by written minutes.

In the recent case of Strodl v. Farrish & Stafford Co., 145 App. Div. 406, 130 N. Y. Supp. 35, the action was on a contract with respect to the purchase of the capital stock of a North Carolina corporation, under which plaintiff agreed that if at any time he should leave the employ of the company to sell to it at its par value all his stock, and the company agreed to buy it back. The North Carolina corporation was succeeded by defendant, a Connecticut company, which assumed all the contract obligations of its predecessors. Plaintiff's connection with the company was severed, and he tendered the 28 shares of stock which he held. The tender was refused, and he brought suit. The complaint was dismissed. This court unanimously reversed; Mr. Justice Laughlin saying:

"Neither the statutes of North Carolina nor of Connecticut with respect to the authority of a corporation to sell its stock, either the original issue or treasury stock, conditionally or to repurchase the same, were proved. Manifestly the statutory law of this state bearing on the subject is not controlling. The validity of the contract and its enforceability against the defendant depend either on foreign statutes or on common-law principles. We cannot take judicial notice of the statutory law of another state, and, since it has not been pleaded and proved, the dismissal of the complaint can only be sustained upon the theory that the contract is void at common law, which could only be on the theory that it is against public policy, for the defense of ultra vires can only be adjudicated on proof of the actual powers and authority of the corporation. That such a contract is not necessarily void as contravening public policy in any and all circumstances was long since decided by our Court of Appeals. City Bank of Columbus v. Bruce & Fox, 17 N. Y. 507, and numerous other decisions to sustain that doctrine. Vail v. Hamilton, 85 N. Y. 453; Booth v. Dodge, 60 App. Div. 23, 69 N. Y. Supp. 673; Joseph v. Raff, 82 App. Div. 47, 81 N. Y. Supp. 546, affirmed 176 N. Y. 611, 68 N. E. 1118; Moses v. Soule, 63 Misc. Rep. 203, 118 N. Y. Supp. 410; Matter of Castle Braid Co., (D. C.) 145 Fed. 224. In these circumstances, if there be any statutory law which rendered the contract ultra vires and void, or if it be unenforceable on the ground that the defendant had no surplus profits with which to repurchase the stock, then I think these were matters of defense to be pleaded and proved by the defendant."

In Richards v. Ernst Wiener Co., 145 App. Div. 353, 129 N. Y. Supp. 951, it was held that a contract to repurchase preferred stock at the stockholder's option was enforceable. The defense was based upon section 664 of the Penal Law (Consol. Laws 1909, c. 40), making it a misdemeanor for any director to concur in any vote or act to apply any portion of the funds of such corporation, except surplus profits, directly or indirectly to the purchase of shares of its own stock. Mr. Justice Scott said:

"It will be observed that the statute does not forbid a corporation to purchase its own stock, nor does it forbid it to enter into a contract to do so. What it does forbid is the consummation of such a contract by making the purchase otherwise than out of surplus. * * * In defending against plaintiff's attempt to enforce it (the contract) the burden rested upon defendant to show that it would be illegal to do so, for there is no presumption one way or the other as to the existence of a surplus."

It seems to us that no valid, legal objection to the recovery had in this case is presented by this record. It does appear, however, that the contract alleged in the complaint and proved upon the trial was that, if the said bonds were not transferred to the plaintiff when demanded, the plaintiff should receive back the sum paid, less the dividends paid to this plaintiff on the stock. This seems to have been lost sight of at the close of the case, and the court charged the jury that, if they found for the plaintiff, their verdict would be, including the interest, $6,913. It appears that the plaintiff had received $410 in dividends.

The judgment and order appealed from should be reversed, unless the plaintiff stipulates to reduce the amount of the verdict by $410, and, if he does so stipulate, the judgment should be modified and affirmed accordingly, with costs to the respondent.

MILLER, J., concurs.